CHIEE JUSTICE ROBERTSON
delivered the oranou oe the court.
This has been a prolonged and vexatious litigation, and this court has hitherto reversed three successive orders of the circuit court, and remanded the case, each time for further preparation; but in no instance concluding or affecting the appellant, Mrs. Faris, in her title to her home, which is the ultimate question involved. And now, though we think that the circuit court again erred in rejecting the cross-petition of the appellants against William A. Hoskins, yet considering the case sufficiently prepared for a final decision so far as the appellants are concerned in the fundamental question which can not be affected by collateral controversies, we will at once proceed to consider that vital question, and to that extent close this case.
Before the year 1852, William Hoskins- — -upright, industrious, economical, and provident — owned his homestead tract of about five hundred acres of first-rate land in Garrard County, at the forks of the turnpike from Lexington to Danville and to Lancaster, equidistant from the bifurcation; and also seven valuable slaves, three of whom were excellent blacksmiths, *279 and a corresponding personalty. Becoming too old for such cares, and being to some extent embarrassed by advancements to most of his children and responsibilities for some of them, he sold his land to his son-in-law, “Dick Robinson,” who sold to John S. Hoskins, who sold to Richard Robinson, who sold to ¥m. A. Hoskins, who resold to the said Robinson, the son-in-law of said ¥m. Hoskins, to whom the legal title was conveyed on the condition that the original vendor’s daughter, Eliza V. Hoskins, now Faris, who had devotedly dedicated a long celibacy to the care of her aged parents, and had never been advanced, should have one hundred acres of the land, or its equivalent, ten thousand dollars, to secure her a home whenever needful. Her mother refused to relinquish her dower unless that provision should be made, and finally made the relinquishment in consideration of that plighted lien for her faithful and otherwise unprovided-for daughter. She preferring another hundred acres in sight of the old homestead, and Robinson being pleased with her choice, her father, true to the trust, bought for her the selected tract; paid for it with her money received and held for that purpose; and, as we may presume from the record, without her knowledge he took a conveyance of the legal title to himself, which, when informed of the fact, she urged him to convey to her; but he deferred it to his will, and assured her that her title should in that way be secured. Immediately after that purchase in the year 1852 her father put her into possession of the land so bought for her, where ever since she has resided as her only home, and so always recognized by her parents, her brothers and sisters and neighbors, and for a long time by her brother-in-law, “Dick Robinson” himself, for whom “Camp Rich Robinson” was so named. Her father died in December, 1862, and in 1866, during the pendency of this suit, her mother, who lived with her, being also dead, she intermarried with her co-appellant, James "W. Faris.
*280 On the 12th of February, 1859, her father, having become indebted to several persons about eight thousand dollars on his son William’s account, as we feel authorized to believe, .mortgaged his slaves and her “ home ” to indemnify the mortgagees, Dunn and Eichardson, and the said Dick Eobinson, for their undertaking to pay within a year that aggregate debt. .She did npt consent to the mortgage of her land, and her father resisted it until overcome, as one of them admitted, by the persuasion of the mortgagees; and doubtless he finally yielded under the belief that his son William would redeem the mortgage, and that if he should fail to do so the other mortgaged property would save her land — as it might and probably would have done had the slaves been opportunely Sold by the mortgagees.
In August, 1863, the mortgagees filed a petition to foreclose their mortgage, which the appellant, Eliza, resisted as to her land on various defensive grounds. The circuit court, however, decreed the sale of that land alone. At the sale by the commissioner under that decree, to prevent the embarrassment and difficulty that might resxilt from a purchase by a stranger, she, advised, as we infer, by her brother William (who promised to become her surety, and who, as appears to us, said he would pay the debt), bought the land for the amount required to satisfy the mortgage, and executed bonds with the said William as her surety.
To compel him to relieve her from these bonds, not yet collected, was the principal object of her cross-petition against him; and that litigation in some form may survive ou‘r judgment in this case, even though her cross-petition was dismissed by the decree appealed from, and by which she was also ordered to pay off the sale-bonds or give up her home.
Upon the facts proved this court is satisfied that, waiving questions of champerty and limitation on account of long and adverse possession, the appellant, Eliza, for not only a good *281 but a valuable consideration, is entitled to the land in contest under a valid and available resulting trust. Such right would be clear at common law; and as she does not appear to have consented to the conveyance of the legal title to her father, and he moreover disregarded the trust by that nominal conveyance, the 20th section of the chapter on real estate (2 Stanton, page 130) does not affect her equitable right as recognized and protected by the modern common law against purchasers with notice of it; but the 22d section of the same chapter excepts and saves it.
And in this case Robinson, as one of the mortgagees, being also a party to the trust, had indisputable and conclusive notice of all the facts from which the trust resulted, and, though not necessary, the other mortgagees had presumptive notice. They all took the mortgage therefore subject to her prior and still subsisting equity, which, combined with her long ;possession under a verbal contract not void, would be sufficiently defensive against them, even if not enforceable as a trust had they been in the adverse possession, and she, as plaintiff, had sued them. She is not estopped by bidding for the land and executing the bonds for the price. She bid for only what was beneficially her own, and thereby did the mortgagees, who knew that they had no right to sell her land, no harm. Her bonds therefore were executed without any binding consideration, and are held on an implied trust of revocation by her volition.
There is no estoppel here, nor in her conduct as nominal executrix associated with the mortgagee, Dunn, as acting-executor ; nor in any of her personal conduct, active or passive, properly considered, do we see anything that should estop a helpless and confiding woman, always ignorant of her rights and of the law, and most of the time covert, from continuing to assert her meritorious and enforceable claim to the land ; and insisting on her exoneration from the burden of again paying for it, and releasing her from the bonds, and thereby *282 devolving the whole obligation on her co-obligor, W. A. Hoskins (who is equitably prosecuted), will do no injustice to him or to the mortgagees. The mortgagees recklessly included her land in the mortgage against the mortgagor’s free will, and without her consent or knowledge, when they knew, or ought to have known, that it was equitably hers, and in her actual possession, unassailed and in conscience unassailable. And moreover, had they sold all the slaves as soon as they might have done so, but little if any of the mortgage debt would have been left unpaid. Only by keeping two of the blacksmiths — proved to have been worth fifteen hundred dollars each as late as the year 1863 — they lost three thousand dollars as a consequence of the emancipation of those slaves in 1865. And though in a former opinion this court suggested that it was not then “prepared” to say that the mortgagees should account for any of the slaves, yet subsequent developments and the present status of the parties have essentially changed the phase of the case on that point. If the mortgagees lose anything it is their own fault.
Nor can W. A. Hoskins justly complain if the burden of the bonds shall fall on him, and thereby this litigation shall by subrogation and transference be carried on by and between him and the mortgagees and executors, as the parties whose conduct originated and prolonged this vexatious and unnecessary strife. This record affords intrinsic evidence that he, without any apparent capital of his own, drew on his father’s generosity for supplies for speculating adventures, and thereby contributed largely to his father’s embarrassing change of condition, otherwise inexplicable. His letters to his father and to his sister Eliza conduce to show that he owed his father more than the debt for which the mortgage was given, and prove that he therefore promised his father that he would relieve him, and promised her that if she should give up her home he would buy for her a better; and these and other facts *283 indicate that the mortgage debt was incurred for his benefit by his father, and that the mortgage would never have been given if he had complied with repeated promises to extricate his father from embarrassment.
Without reference to other circumstances, we are satisfied, upon the record now before us, that he owed his father as much at least as the amount due on the mortgage, and therefore, as between the appellant Eliza and himself, he should not complain if the whole burden of the sale-bonds be put on him. But as his' indebtedness to his father’s estate has not been litigated between him and the mortgagees, or between him and Dunn as executor, and especially as the contemplated litigation between them as antagonist parties may evolve other material facts, what we have said is not to conclude him on that question, or fetter a full investigation between him and them as opposing parties. He will be entitled to all credits to which the mortgagor, if living, would be entitled in a contest between him and the mortgagees, whether on account of any of the slaves, or payments of any portion of the mortgage debt, or otherwise. And these will be the principal questions in the transposed litigation between parties not hitherto conflicting.
From the foregoing considerations, we conclude that the appellant, Eliza, should be released from the sale-bonds, and is entitled to a conveyance of the one hundred acre tract of land to her separate use in fee-simple, unincumbered by the unpaid consideration, and that the payment of the bonds should be settled by an ulterior litigation on amended pleadings between the mortgagees and executor on one side and Wm. A. Hoskins on the other.
Wherefore the judgment against the appellant, Eliza, subjecting her to the payment of the sale-bonds and dismissing her cross-petition, is reversed, and the cause remanded with instructions to dismiss the petition of the mortgagees so far as it affects her, and to cause a conveyance, as just indicated, *284 to be made to her as purchaser at the sale by the commissioner, and also to allow the executor and mortgagees and Wm. A. Hoskins to amend their pleadings so as to litigate between themselves concerning the payment of the bond for which said William is now alone responsible as co-obligor.
Judge Peters dissented from the foregoing opinion.
To appellees’ petition for rehearing Chief Justice Robertson delivered the following response:
As the opinion in this case has been in several respects misconceived, and consequently misrepresented, we consider a brief response to two very elaborate petitions for a rehearing but respectful to the zealous counsel who filed them, and befitting the cause of harmonious jurisprudence and judicial rectitude and authority. An anxious scrutiny of the facts and arguments urged in the petitions, and a careful reconsideration of the opinions they assail, having resulted in a more unanimous adherence to the essential facts and established principles which sustain it, we will proceed with a very summary exposition of the grounds of complaint, and of the true facts and right law on which it will be cheerfully left to rest for the vindication of its accuracy and justice. And in this condensed review the order of the attack will be observed.
1. The resulting trust, which is the corner-stone of the opinion, is denied rather irresolutely, without a denial of the indisputable facts or the citation of any authority to countenance the negation. The condensed facts show: first, that for the most meritorious consideration of both gratitude and paternal duty, and also for a valuable consideration, as recited in the opinion, William Hoskins dedicated in the hands of the purchaser of his homestead farm ten thousand dollars as a trust fund to secure to his daughter Eliza a home of her own; second, that the pirrchaser paid out of the purchase-money the amount which, reinvested, bought Eliza’s home according to the requisitions of her father for that special purpose; *285 third, that merely because he made the contract of reinvestment and was a protecting father, the legal title was conveyed to him without knowledge or consent, and on her complaining of that formal lodgment he soothed her by the assurance thát it was best, and that her title should be secured; fourth, that he forthwith put her into the exclusive possession of the land as her home, and that he and the family and neighbors ever afterward recognized it as hers.
On these facts, did not a trust result to her use more certainly than it would have done had he merely for his wife’s relinquishment of dower alone executed a covenant to do what he afterward faithfully did? And did not the consideration for the conveyance to her father proceed therefore as much from her as it would have done had it been paid by her own hands ? The consideration from her or on her accownt, and the title made to her father, nothing else appearing, implied a resulting trust, according to abundant authority not now controverted or doubted by scientific jurists; and such trusts, being excepted from the operation of the statute of frauds, may be established by oral testimony as satisfactorily as by written evidence. On this subject we will only refer to Story’s Equity, and to Chancellor Kent’s opinion in the case of Boyd v. McClean, 1 Johnson’s Chy. Rep. 583, in which the chancellor defines the principle of such trusts, and illustrates it by a collation of the leading cases ab ovo. And the trust enforced by him in that case was not as conclusively established as that which we recognize and uphold in this case.
2. The foundation being thus fixed, the superstructure is assaulted in the impotent form of estoppels, never pleaded in this entire suit, and of course never litigated. And the first of these, intimated for the first time in the petitions, is Eliza’s qualification as executrix. Though she never acted, yet her qualifying alone is urged as an election to give up her right to her home. The idea of such an elective estoppel is a gross *286 perversion of the principle of binding election, which is that a devisee can not claim under and against the same will; and that, before a devisee can be required to make an election, the will must dearly show that the testator so intended. No such case is presented by the will of William Hoskins, nor did he so intend. He did not even devise Eliza’s land'at all.
In chapter 30, on Election, 2d volume on Equity Jurisprudence, Mr. Story, after defining the principle, says, section 1075 : “Every case of election therefore supposes a plurality of gifts or rights, with am. intention, express or implied, of the party who has a right to control one or both, that one should be a substitute for the other.” Then, illustrating the peculiar difficulty of making a clear case of election, he says, section 1086: “It may be stated that, in order to raise a case of election, there must be a clear intention expressed on the part of the testator to give that which is not his property. A mere recital in a will that A is entitled to certain property, but not declaring the intention of the testator to give it to him, would not be a sufficient demonstration of his intention to raise an election.” Again, speaking of a. bar to a wife’s dower by a testamentary provision for her, he says, section 1088, that “such an intention must be dear and free from ambiguity ; and it could not be inferred from the mere fact of the testator’s making a general disposition of his property, although he should give his wife a legacy.” And, speaking of the presumption- of an actual election, he says, section 1098 : “Before any such presumption can arise it is necessary to show that the party acting or acquiescing was cognizant of his rights; and when this is ascertained affirmatively it may be further necessary to consider whether the party intended an election.
Tested by these established clues, there can be no rational doubt that there is nothing having the semblance of election in this case. Not only did the will not devise her home— unless to herself as residuary devisee — but its recital only that *287 his debts were secured by mortgage does not allude to her land, or even intimate an expectation that a foreclosure would touch it. And it is almost certain that when the will was proved she did not know that her land was included in the mortgage; and it is clear that there can be no presumption of actual election. She never accepted or claimed anything under the will, but cleaved to her land all the time; and not only was there no case for election, but it is evident that she did not so understand. It is equally clear that she was, if even bound to elect, neither cognizant of her rights nor intended to elect to give up her home. The contrary is demonstrated by her conduct.
The next pretense of estoppel is her bidding for the land and giving her bonds for the price bid. Had this been pleaded as an estoppel she might have avoided its effect by sufficient proofs and explanations; but, not being pleaded, that question was not litigated. This shows the reason why an estoppel must be pleaded before it can operate as such. But had it been pleaded it would have been unavailing.
The decree of sale had been reversed by this court, and is yet dead; and the reason why the sale also was not set aside was that Mrs. Faris had not asked it, and as purchaser might not need or desire it. Then she asserted her rights under the resulting trust to avoid her obligation as bidder, and confined the litigation to the question whether she was liable for the price bid for her own land, which the mortgagees, procuring ‘the mortgage with full notice of her equity and against the free consent of the mortgagor, had no right to sell. This was permissible and proper, especially as the reversal of the decree for sale left nothing behind except the question of enforceability of her bonds given for her own property, and therefore for no valuable or binding consideration. The reasons why she bid at the sale and gave her bonds are sufficiently explained in the opinion; and certainly she did not intend thereby to *288 waive her claim to the land as owner, but bid only to secure her title from disturbance. Nor were the mortgagees prejudiced by her conduct. They knew that they were wrongfully selling her land against her will; and had it even been sold to a stranger without notice of her right, if the sale as well as the decree for it had not been set aside, she would havé been certainly entitled to reclamation against the mortgagees. We can not see therefore how her conduct in this respect could have forfeited any right for which she was still struggling openly, perseveringly, and confidently.
Then the trust being established, notice of it to the mortgagees when by evident misconception or coercion they improperly obtained the mortgage, the want of any proof of a waiver of hér title or of any estoppel against the assertion of it, and her non-liability for the price bid by her at the empty sale, should, as we adjudged, close the litigation so far as Mrs. Faris is concerned. Nothing more remains for litigation against her; and therefore we decided that the petition against her should be dismissed, and that the legal title to her land should be conveyed to her, and by this we still stand.
But as the mortgage debt does not appear to have been fully paid, and the mortgagor’s estate may alone be liable for it, we authorized a transformed litigation between the executor, mortgagees, and W. A. Hoskins, with whom, as an alleged debtor of the mortgagor, she has been interpleading for the purpose of compelling him to pay the debt; and this subrogation and transposition is the best we can do for all parties to prevent multiplicity and injustice. But of this modification the counsel of W. A. Hoskins complains. Up to this stage of the conflict both of the petitioners were concurrent; but here they diverge and become antagonistic. This is just what we expected.
But why should W. A. Hoskins object to a continuation of the litigation in this modified form ? It can not hurt him; nor *289 can it be material to -bis interests as now involved whether his sister or the mortgagees are his antagonists; nor should he complain that our judgment leaves him on the bond after exonerating her. He has not denied her allegation that he' advised her to buy the land, promised to be her surety, and to stand between her and the debt so incurred. Then, as between her and him, he now appears to stand in equity as the principal obligor; and therefore discharging her does not release him unless the mortgagees shall fail to establish his alleged and prima fade indebtedness to the mortgagor. Holding him alone on the bonds is only precautionary and can not increase his ultimate liability. If it shall finally appear that when he signed the bonds he owed the mortgagor nothing, then he too should be released from the obligation, as without consideration as to him any more than as to Mrs. Faris, and the mortgagees must stand as they would have stood if the mortgage had not included the land. All they can be entitled to beyond that limit they must get from him to the extent of his liability to his father. The litigation on this question as commenced by Mrs. Faris will only be continued, and so the opinion intends. He may make any defense against the mortgagees and the mortgagor’s executor which he could make against the mortgagor himself were he living and a party complaining. We are not inclined therefore to change the opinion in this branch of the case. Justice seems to require this ulterior litigation in this form.
And now we will only add that, having already heard all that could be expected from a re-argument, and understanding the case as thoroughly as we could hope ever to understand it in all its phases, we deem it not only useless but unjust further to prolong this litigation in this court by granting a rehearing.
Wherefore both petitions for a rehearing are unanimously overruled.