## Louisville Tobacco Warehouse Company v. Lee.

(Decided November 14, 1916.)

### Appeal from Mason Circuit Court.

1. Appeal and Error—Verdict Flagrantly Against the Evidence.—In a suit by a principal against his factor to recover damages for losses sustained on account of the factor's alleged departure from the instructions of the principal in the sale of his property, the verdict of the jury finding that there was a departure was flagrantly against the evidence.

2. Factors—Duties and Liabilities of.—If the principal sustains loss on account of the failure or refusal of the factor to obey his instructions, the factor is liable to the principal for the damage he has suffered by reason of the departure unless the principal by his subsequent course of conduct, after having full knowledge of all

the circumstances connected with the transaction, puts himself in the attitude of ratifying or approving what his factor did.

3. Factors—Duties and Liabilities of.—If the principal has knowledge of the violation of or departure from his orders and the extent of the loss he has sustained thereby, and desires to hold the factor responsible, he must within a reasonable time thereafter make complaint to the factor and disaffirm or disapprove of his acts in such manner or way as to reasonably apprise him that he will look to him for indemnity. If he fails to do this, he will be deemed to have waived his right to recover indemnity or damages.

4. Estoppel—Must be Pleaded.—A factor who claimed that his principal had ratified an alleged departure from his instructions cannot avail himself of this defense in a suit by the principal to recover damages for a departure from his instructions unless he pleads by way of estoppel the ratification of the principal. Evidence of ratification or approval in such a case is not allowable under a pleading that merely traverses the complaint of the principal.

WORTHINGTON, COCHRAN & BROWNING and HUMPHREY, MIDDLETON & HUMPHREY for appellant.

J. M. COLLINS and R. D. WILSON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

In December, 1910, the appellee Lee, and the appellant warehouse company entered into a verbal contract by which the warehouse company was to advance Lee, who was a tobacco buyer and trader of large experience, living in Lewis county, money for the purpose of enabling him to purchase tobacco and ship the same to the warehouse company for sale at its warehouse in Louisville, Ky. Under this arrangement the warehouse company, between December, 1910, and January, 1914, furnished and advanced to Lee about a hundred thousand dollars with which he purchased several hundred hogsheads of tobacco and shipped them to the warehouse company for sale. About 165 hogsheads of the tobacco so purchased were sold in the spring of 1911, but the whole of the purchase was not closed out until February, 1914, at which time the account between the parties was balanced and it was found that after charging Lee with the advancements made to him and interest thereon, and items of insurance and storage, and giving him credit by the proceeds of the tobacco, all of which was sold by the warehouse company at its house, there was a balance due the warehouse company of $12,984.07, and

to recover this amount with interest from February 20, 1914, it brought this suit against Lee.

Although Lee in his answer controverted all the averments of the petition as to the amount of his indebtedness, his real defense was set up in the second paragraph of his answer in which he said that under the arrangement or contract between them "said plaintiff was to advance money to the defendant with which to pay for tobacco, which he had purchased, on condition that said defendant would ship to and sell the tobacco, so purchased, by and through the warehouse of the plaintiff in Louisville, Ky., that said tobacco was to be handled and sold by said plaintiff upon the direction and at such times as he requested, in the open market at said People's Tobacco Warehouse at Louisville, Ky., one of the warehouses which was handled, controlled and used by the said plaintiff; that after deducting the usual and proper charges, the proceeds of said tobacco were to be credited upon the advancements so made by said plaintiff to the said defendant. . . . . . . .

"That on or about ........... day of February, 1912, this defendant had on storage and for sale with the plaintiff in Louisville, Ky., at said People's Tobacco Warehouse, ........... hogsheads of tobacco, containing approximately one million pounds of leaf tobacco; that said tobacco was then worth, and was selling over the market in plaintiff's warehouse, at prices which, if said tobacco were then disposed of, would have netted this defendant a net profit on said tobacco of ten thousand dollars; that this defendant at said time ordered and directed said plaintiff to at once dispose of said tobacco over the tobacco market then being conducted at its warehouse, but that the plaintiff failed and refused to sell said tobacco, as it was so directed to do by the defendant; and that by reason of the failure and refusal of the plaintiff to sell and dispose of said tobacco at the then prevailing prices on the open market, at their warehouses in Louisville, Ky., in accordance with the contract, directions and rights of the defendant, this defendant lost and was deprived of the net profit of ten thousand dollars, which he would otherwise have made and realized from said purchase of tobacco, and in addition put defendant to great expense and loss in carrying the said tobacco over, to-wit, an average of fifteen dollars per hogshead, per annum.

"......... That in the winter seasons of 1912 and 1913 the prevailing prices of tobacco again were such that so much of said tobacco as was still undisposed of, which at that time amounted to ............ hogsheads, approximately 750,000 pounds, could have been disposed of at the then prevailing prices, at such a value as would have left this defendant a small marginal profit on the whole transaction of approximately two thousand dollars, and defendant at said time again urgently requested and directed the plaintiff to sell and dispose of said remaining tobacco upon said market, but that the plaintiff failed and refused to comply with defendant's request and directions, and did not sell and dispose of said tobacco at said time while the prevailing prices were such as to render it possible to dispose of said tobacco at a profit, but on the contrary retained said tobacco in their warehouse and continued to dispose of it in small lots at various intervals during the year 1913 and up until February, 1914, when the last of it finally was disposed of at the price set out in plaintiff's petition and exhibits.''

To this answer a reply was filed controverting all of the affirmative allegations, and thereafter the case went to trial with a jury, and there was a verdict in favor of Lee on his counterclaim for $9.68.

On this appeal by the warehouse company from the judgment denying it any recovery no complaint is made respecting the admission or rejection of evidence, nor are the instructions criticised, a reversal being asked on two grounds: first, that the trial court committed error in refusing to instruct the jury to find a verdict for it, or if this was not error, then the verdict was flagrantly against the evidence and for this reason a new trial should be ordered.

It will be seen from this statement of the case that the principal matter for our decision is, did the warehouse company, at any time when it was ordered or directed by Lee to sell his tobacco, fail or refuse at such time, or within a reasonable time thereafter, to sell or offer it for sale, and if so, what loss, if any, did Lee sustain by reason of such failure or refusal? This was the only issue in the case made by the pleadings or submitted in the instructions. As the correct answer to this question depends on the facts appearing in the rec-

ord, it will be .necessary to state them with more full-
ness than is usually required.

Lee, testifying in his own behalf, said, in substance,
that the agreement between himself and the warehouse
company was that he should purchase the tobacco, draw
on it for the money to pay for it, and ship the tobacco
to the warehouse, where it was to be held until he. or-
dered it sold, and when it was sold on his direction the
proceeds of the sales were to be placed as a credit on
his account for the money advanced.    And it may be
here noticed that the warehouse company does not ques-
tion the correctness of this statement of the contract.

' He said that he commenced buying tobacco in De-
cember, 1910, and bought something over a million
pounds.    That during the winter of 1910-11 he shipped.
to the warehouse 165 hogsheads of tobacco, which were
sold during that winter at an average profit of about
95 cents on the hundred pounds.    The balance of his.
purchase, amounting to some eight hundred hogsheads,
was shipped to the warehouse in the summer and fall
of 1911, but no attempt was made to sell it until early
in 1912, on account of the low price this grade of to-
bacco was bringing before that time.

It also appears that in December, 1911, the ware-
house company advanced him some twenty thousand
dollars, and with this money he bought and shipped
other tobacco to the warehouse.    On February 29, 1912,
at which time he had in the warehouse probably eight.
hundred hogsheads, there was a marked advance in the
price of the grade of tobacco he had on hand, and on
this day he says that he told True, the manager of the
company, "Tobacco seems to be high, and that it is a
good time to sell, and let's put up a lot of this tobacco
and sell it.    He said to me, 'You know I will do any-
thing I can in reason but it is impossible to put up much
of the tobacco, although we can put up a few hogsheads.
and get a line on it.'    We put up eight hogsheads and
it was sold at an average of $11.70, and after it was sold
True said that he was highly pleased with the sale for
it showed the tobacco to be worth more than we thought.
it was.    He said, 'You have a profit on this tobacco of'
from eight to ten thousand dollars if it is sold,' and I.
said, 'Put it up and sell it,' and he said, 'I can't be-
cause my orders are to sell the new.'    He said, 'I will
show you my orders,' and he got his book and said, 'I.

have two weeks' orders ahead and it is new tobacco and, of course, I must obey orders.' "

He further testifies that the market was good until about the first of April, 1912, when it declined to such an extent that his tobacco could not be sold at a profit. That none of his tobacco, except fifty-seven hogsheads, was sold during the high market, and that if all of it had been sold he would have made a profit of several thousand dollars.

He further said that in December, 1912, some of this tobacco was put up and brought a good price, and that he again told True "to be sure and sell all of his tobacco in January and February, 1913," but that they sold only about three hundred hogsheads during the whole year of 1913. He introduced a letter received from True, dated December 12, 1912, in which True said, "The market on all tobacco this week is the best we have had since last January, and the president instructs me to write you to come down next week and offer some tobacco or else send the numbers you want offered and we can attend to it for you." In reply to this he says he wrote True a letter, which is not in the record, to put up all of his tobacco and sell it during this time, but that he sold only about half of it during the winter of 1912-13 and did not offer any excuse for his failure to sell as directed. He also introduced another letter from True, dated January 25, 1912, in which True wrote him on account of a sale of thirty-one hogsheads, adding, "the market is holding strong on old Burley thus far and we will continue to offer next week." Testifying further, he said that in April the price declined again and no sales of his tobacco were made until the fall of 1913 and the spring of 1914—the last sale being in February, 1914—during which time the market was not near so good as it had been in the spring of 1912 and the winter and spring of 1912-13.

He further said: "I did all I could to get it sold. Of course, I did not have the selling of it. I was doing business with these people and I wanted everything pleasant, and I did all I could to get it sold, and that was all I could do. I had a right to say when it could be sold, but I had no way to get it up. I could have taken the tobacco from their warehouse, but to do this I would have had to pay them back their money and warehouse fees and I was not able to do this."

On his cross-examination he admitted that on September 26, 1912, he wrote the warehouse company and proposed that they take all of his tobacco then in the warehouse in satisfaction of his indebtedness, which proposition was rejected by the company. Asked why he did not, in his letter of September 26, 1912, in which he offered to surrender this tobacco in settlement of his account, make some complaint about the loss he had sustained on account of the failure to put his tobacco up in the spring of 1912, he said, "I wanted to get the thing wound up in a pleasant, good-humored way, as I had always gotten on all right with these fellows. If I had said to Mr. Bernard, the president of the company, or Mr. True, 'You fellows have acted wrong with me,' there would have been no chance of a settlement and what I wanted was to settle up."

It also appears that in September, 1913, he again wrote the warehouse company proposing to surrender his tobacco in settlement of his indebtedness but that the warehouse company again wrote him that it could not accept his proposition.

In September, 1913, Bernard, the president, wrote him a letter in which he said, among other things, "You have had control of the selling of your tobacco and the prices at which you are willing to make sales and we have made every effort possible to effect sales to meet your views."

It also appears that on September 30, 1913, Lee wrote a letter in which he said he had received the letter declining to accept his proposition of settlement and also telling him that his tobacco ought to be sold, and in this letter Lee said, "Go ahead and sell it as you think best." Asked again why he did not make some complaint in the fall of 1913, or previous to that time of the refusal of the company to offer his tobacco for sale when he ordered it up, he again said that he hoped to be able to make a settlement and for that reason did not want to get up any disagreement.

During 1911, 1912 and 1913 a great many letters were written by the warehouse company to Lee advising him of the condition of the market and cautioning him to be careful in making purchases. There were also a number of letters written by Lee during this time on the subject of the tobacco market and his dealings with the company. But in no one of these numerous

letters is there found any intimation on the part of Lee that he had any fault to find with the warehouse company on account of its failure or refusal to put up his tobacco at any time when he ordered it put up or that the warehouse company at any time departed from his instructions. Nor does it appear that Lee at any time during 1911, 1912 or 1913 made any personal complaint indicating that he was dissatisfied with the manner in which the warehouse company offered his tobacco for sale, or that he had any complaint against the company growing out of its failure to put his tobacco on the market when, as he claims, he ordered it sold. It also appears that Lee was notified promptly each time a sale of his tobacco was made and furnished with a statement showing the price at which it was sold.

J. W. Wells, a witness for Lee, was asked if he heard a conversation in February, 1912, between Lee and True, and in response he said, "I heard Mr. True tell Judge Lee that if his tobacco continued to sell like it was selling, it would make him between ten and eight thousand dollars." This witness also said he did not hear Lee order his tobacco to be sold, but that Lee told him that "he tried to order it up and they told him they could not put it up; that is what he told me."

There was some other evidence on behalf of Lee tending to show that the grades of tobacco owned by Lee were bringing good prices in the winter and spring of 1911-12 and 1912-13.

True, when asked about the directions Lee testified he gave in February, 1912, to put his tobacco up and sell it, said that he always sold the tobacco when ordered to do so by Lee, and that if he had directed him to sell all of it he could have done so, although there may have been an occasional day when on account of other orders Lee's tobacco could not be offered. It further appears from his testimony that in January, February and March, 1913, 316 hogsheads of Lee's tobacco were sold, and that at no time, except an occasional day, was there any departure from Lee's instructions or any reason why there should have been.

To sum up the matter, the substance of the evidence on behalf of Lee, which consists entirely of his own statements, is to the effect that in February, 1912, tobacco was bringing good prices and he ordered the warehouse company to sell his holdings, but it failed and

refused to do so. That again in the winter of 1912-13, when tobacco was selling well, he ordered it to sell what he had, but it again failed and refused to do so, and as a result of its failure to put his tobacco on the market when he ordered it sold, he sustained a loss of some ten thousand dollars, perhaps more; while the evidence for the warehouse company is to the effect that it always offered it for sale when he ordered it sold, and could have sold it in the winter of 1911-1912 or 1912-13 if he had directed it sold, but he did not give such directions.

The evidence for the warehouse company, which consists largely of letters written by it to Lee and by Lee to it, further shows very clearly that it did not disobey his instructions in reference to selling this tobacco or at any time fail or refuse to put his tobacco on the market, except perhaps for an occasional day when conditions were such that it could not be offered. These letters further show that the warehouse company was at all times ready, willing and able to comply with any request made by Lee in respect to offering his tobacco for sale; that it recognized fully his right to control the sale of this tobacco and had no disposition to interfere with its sale or prevent him from selling it when he wanted it sold. The record further shows, virtually without dispute, that the warehouse company was anxious to have the transaction closed out on account of the large amount of money it had invested in the tobacco and the prevailing conditions, which seemed to indicate that there might be a loss in the sale of the tobacco.

It is further an undisputed fact in the record that Lee did not, until after all of his tobacco had been sold, and perhaps not until this suit was brought, at any time or in any manner, express dissatisfaction with the way in which the warehouse company handled his tobacco or make any complaint that it failed or refused to offer his tobacco for sale when he ordered it sold. It is also an admitted fact that almost every week from December, 1910, until the tobacco was all sold, the warehouse company wrote him a letter advising him of the condition of the market and telling him how much of his tobacco had been sold, and at what price. During this time Lee was also frequently in Louisville about the warehouse and also wrote the warehouse company many letters in connection with this tobacco business, but in no one of the letters is there any intimation that he was

not entirely satisfied with the manner in which the warehouse company managed his tobacco, although of course he knew, according to his evidence, that in February and March, 1912, it had failed and refused to comply with his directions and had subjected him to a loss of several thousand dollars. He also knew, early in the spring of 1913, that the directions he says he gave in the winter of 1912, to offer his tobacco for sale, had been disobeyed, and he also knew at this time approximately at least what loss he had sustained by reason of the failure to obey his directions.

We are, therefore, of the opinion, after reading carefully the record, that the verdict of the jury on the only issue submitted was flagrantly against the evidence, and for this reason the judgment should be set aside and a new trial granted.

It is, however, insisted on behalf of the warehouse company that its motion for a directed verdict in its favor should have been sustained. This insistence is put upon the ground that if it should be assumed that the warehouse company failed and refused to offer for sale the tobacco when it was ordered to be sold by Lee, he adopted and ratified this refusal by his acts and conduct after he had full knowledge of the refusal to obey his instructions and the extent of the loss he had sustained in consequence thereof, and was therefore estopped to defeat a recovery of the amount due on the plea that he had been damaged by the departure from his instructions. There is no dispute about the proposition that if the principal sustains loss on account of the failure or refusal of the factor to obey his instructions, the factor is liable to the principal for the damage he has suffered by reason of the departure from his instructions, unless the principal by his subsequent course of conduct, after having full knowledge of all the circumstances connected with the transaction, puts himself in the attitude of ratifying or approving what his factor did. If he does this, he cannot recover damages on account of the factor's departure from his instructions. If the factor violates or disobeys the instructions of his principal whereby the principal sustains loss, the principal, if he has knowledge of the violation of or departure from his orders, and the extent of the loss he has sustained thereby, and desires to hold the factor responsible, must within a reasonable time thereafter

make complaint to the factor and disaffirm or disapprove of his acts in such manner or way as to reasonably apprise him that he will look to him for indemnity. And if the principal, after being in full possession of all the facts relating to the unauthorized acts of the factor and the extent of the loss he has sustained, fails to disaffirm or disapprove the acts of the factor within a reasonable time, or fails to notify him that he expects to hold him responsible for the loss sustained, he will be deemed to have waived his right to recover indemnity or damages, and especially is this true when the dealings between the principal and the factor subsequent to the time the principal had knowledge of the violation of his orders and the loss he had sustained are of such a nature as to show that the principal ratified or approved the conduct of the factor.

Thus it was said in Graves, Headley & Co. v. Cord, 19 Ky. L. R. 1893, which was a case very much like this: "It is a well established rule of law that a principal must, within a reasonable time, elect to approve or disapprove the unauthorized acts of an agent, of which he has been informed. He cannot remain quiet and await the vicissitudes of a fluctuating market, and if prices rise disaffirm and claim the difference or decline to acquiesce in the same. If a commission merchant is under orders to hold for a better market, the principal takes the risk of a decline, and he cannot, where instructions have been disobeyed, receive the money and silently await and watch the market, and, if the prices advance, claim the difference. One who, with full knowledge, accepts the proceeds of an unauthorized sale of his property is estopped to dispute the validity of the sale." To the same effect are Comer v. Way, 107 Ala. 300, 54 Am. St. Rep. 93; Meyer v. Morgan, 51 Miss. 21, 24 Am. Rep. 617.

In Ruling Case Law, vol. 11, page 764, it is said: "As in other cases involving the relation of principal and agent, the unauthorized acts of a factor in dealing with the property of his principal may be expressly or impliedly ratified by the principal. . . . The ratification by the principal of the agent's acts or omissions, in order to be binding, must, however, be made with full knowledge of the facts."

In 12 A. & E. Ency. of Law, page 653, the rule is thus stated: "Where a principal is notified by his fac-

tor of a departure from his instructions, he should, within a reasonable time, express his disapproval of such departure, otherwise he will be held to have ratified or waived it." To the same effect is 19 Cyc. 142.

Although the evidence on the subject that Lee did ratify and approve the departure from his instructions, if there was any departure, is very convincing, yet we do not think the principle relied on by counsel in their brief is available on the record before us, because we do not find that it was made an issue in the pleadings. This defense comes in the nature of an estoppel and should have been set up in the reply which, under section 98 of the code, may contain "a statement of facts which constitute an estoppel against, or avoidance of, a set off, counter-claim or defense stated in the answer." As it is, the only matter contained in the reply was a traverse, and under a traverse defenses by way of estoppel cannot be relied on. Under the pleadings as made up Lee was only required, in making out his case, to show the departure from his instructions and the damage he sustained in consequence thereof. It was not necessary that he should have produced any evidence showing that after the departure from his orders and resulting damages he disapproved or disaffirmed what the warehouse company did. If the defense of estoppel, based on the acts and conduct of Lee showing his affirmance of the course of conduct pursued by the warehouse company had been made a distinct issue in the case, possibly he might have succeeded in avoiding its effect by satisfactory explanations: Faris v. Dunn, 7 Bush 276; Excelsior Coal Mining Company v. Virginia Iron & Coal Co., 23 Ky. L. R. 1834; Hilton v. Colvin, 25 Ky. L. R. 1808; Brocking v. O'Bryan, 129 Ky. 543; Pemberton and Price v. Teeple Piano Co., 144 Ky. 518; Bracket v. Modern Brotherhood of America, 154 Ky. 340.

On a return of the case, however, the warehouse company may file an amended reply setting up the defense of estoppel, and Lee may also set up by way of amendment any other matter he desires to rely on.

Wherefore, the judgment is reversed, with directions for a new trial in conformity with this opinion.