**AMERICAN FLOUR CO., Inc. et al. v.
PICKRELL & CRAIG CO., Inc.**

Court of Appeals of Kentucky.
May 22, 1953.

Steinfeld & Steinfeld, Louisville, for appellant.

Doolan, Helm, Stites & Wood, Louisville, for appellee.

STEWART, Justice.

This action was brought by American Flour Company, a Massachusetts corporation, hereinafter referred to as "American," to recover $1440 from Pickrell & Craig Company, a Kentucky corporation doing business as a merchandise broker in the City of Louisville, herein called "Pickrell". The alleged debt is based upon an order for merchandise placed by Pickrell with Allied Salt & Chemical Company, a Massachusetts corporation, referred to hereinafter as "Allied," for Maysville Grocery Company of Maysville, Pickrell then acting as the agent of Allied in placing the order. In June, 1948, Allied went out of business and sold its assets, including its claims, to American, and it is admitted any liability of Pickrell to Allied inured to the benefit of American.

It is undisputed that Pickrell, the agent, made a mistake that caused Allied, the principal, to suffer a financial loss. The question to be resolved is: Was the broker released from liability because the principal, with knowledge of all the facts, ratified or waived the agent's mistake? The case was submitted below upon an agreed statement of facts without the intervention of a jury and the lower court found for Pickrell. American has appealed from the judgment

entered, contending that the evidence required a finding in its favor. We find the following facts stipulated:

In October, 1946, Pickrell received an order for 200 cases of a commodity known as "Sweater Bath" from Maysville Grocery Company, but, through mistake, Pickrell sent to Allied an order for 600 cases of the product, with the result that on November 4, 1946, Allied shipped 600 cases of Sweater Bath to the grocery company. On November 22, 1946, prior to the receipt of the shipment by the grocery company, Pickrell discovered the error, and dispatched a letter to Allied notifying it accordingly. In this communication Pickrell informed Allied the manager of the grocery company was of the opinion that he might within a reasonable time dispose of all 600 cases. It was suggested, however, that if Allied should prefer to use the 400 cases to fill orders elsewhere it might furnish instructions to the grocery company to reship pursuant thereto. On December 16, 1946, Allied wrote directly to the grocery company to the effect that it had authorized Pickrell to handle the excess shipment in any way the latter thought best.

On March 12, 1947, after three months had elapsed, Allied forwarded information to Pickrell to offer a bonus to its salesman of fifty cents on each case in an effort to increase the movement of the Sweater Bath held by the grocery company. Two months thereafter, Pickrell informed Allied by letter that the product still was not selling and requested that shipping instructions be sent to the grocery company. No shipping instructions were sent but, instead, Allied wrote Pickrell on May 20, 1947, that "to eliminate any further storage charges it will be willing to pay an additional bonus of $1 a case to Pickrell's salesman in order to dispose of the merchandise." On August 11, 1947, Pickrell again wrote Allied that none of the Sweater Bath had been disposed of and suggested that, perhaps, a case should be given free with each case sold. The letter of August 11th crossed the path of one from Allied to Pickrell dated August 12, 1947, in which Allied for the first time suggested that the 400 cartons of Sweater Bath be sent back to it. In a communica-

tion dated August 14, 1947, Allied acknowledged receipt of Pickrell's letter of August 11, 1947, but no reference was made to Allied's previous letter to Pickrell of August 12th, wherein a proposal had been advanced that the 400 cases be returned; rather, Allied made still another proposition for increasing the sale of the Sweater Bath.

On October 1, 1947, the grocery company advised Pickrell it had been absolutely unable to sell the Sweater Bath, and, consequently, it intended to send the 400 cases back to Allied. Pickrell assumed the grocery company had performed the purpose it had expressed by returning the Sweater Bath to Allied and on October 9, 1947, it notified Allied to be on the lookout for the shipment. Allied replied a week later that it had not yet received the Sweater Bath from the grocery company. No further correspondence ensued between Pickrell and Allied for almost a year.

On June 30, 1948, Allied went out of business and, as we have already stated, sold its assets including its accounts to American. On October 29, 1948, the manager of Pickrell's branch at Lexington wrote to Pickrell at Louisville informing it that the grocery company still had the 400 cases and requested advice as to the disposition of the merchandise. A letter was immediately dispatched to Allied seeking instructions with regard to disposal of the Sweater Bath. A response to this letter was received not from Allied but from American notifying Pickrell that American had purchased the assets of Allied, including the debt of the grocery company. American declined to accept the 400 cases and demanded that Pickrell promptly settle the account. In December, 1948, the subject matter of this controversy was placed to the account of Allied in a public warehouse at Lexington by the Grocery company. Pickrell refused to pay the claim and this litigation followed.

There is no dispute between the parties hereto about the proposition that if the principal sustains loss on account of the failure or refusal of the broker to obey his instructions, the latter is liable to the principal for the damage he has suffered by reason of the departure from his instructions, unless the principal by his subse-

quent course of conduct, after having full knowledge of all the circumstances connected with the transaction, puts himself in the attitude of ratifying or approving what his broker did. See Smith v. Fidelity & Columbia Trust Co., 227 Ky. 120, 12 S.W.2d 276, 62 A.L.R. 1353, and Shatz Realty Co. v. King, 225 Ky. 846, 10 S.W.2d 456, 60 A.L.R. 1374. And in Louisville Tobacco Warehouse Co. v. Lee, 172 Ky. 171, 189 S.W. 16, 20, this Court laid down this rule which we think is in all respects applicable to the facts of this case:

"* * * If the factor violates or disobeys the instructions of his principal, whereby the principal sustains loss, the principal, if he has knowledge of the violation of or departure from his orders, and the extent of the loss he has sustained thereby, and desires to hold the factor responsible, must within a reasonable time thereafter make complaint to the factor and disaffirm or disapprove of his acts in such manner or way as to reasonably aprise him that he will look to him for indemnity. * * *"

Applying the foregoing principles of law to the facts of this case, we think there can scarcely be any doubt but that Allied ratified the mistake made by Pickrell. From the time the unauthorized act was committed by Pickrell until Allied went out of business, a period of 18 months, the latter, with full knowledge of Pickrell's violation of its duty, failed to manifest in any way an intention on its part to hold Pickrell responsible. Not only did Allied acquiesce in the retention of its property by the grocery company under arrangements that it approved from time to time but it made it plain that Pickrell was to use its judgment in handling the excess shipment and that Allied would absorb all consequences flowing therefrom. These facts convince us that Allied approved the conduct of Pickrell and waived any recourse it might have against the latter.

More than that, it is clear that Allied, after being in full possession of all the facts relating to the unauthorized act of Pickrell and the extent of the loss it

had sustained, failed within a reasonable time to disaffirm what the broker had done or to notify the latter that it expected to hold it liable for the loss sustained. Therefore, the principal is estopped at this late hour to assert a claim for damages against the broker. Obviously, American, the assignee, has no greater rights than Allied, the assignor, and, since Allied cannot recover in this case, American likewise cannot.

Wherefore, the judgment is affirmed.